[Cite as *State v. York*, 2022-Ohio-2457.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-11-147 |
| | : | O P I N I O N |
| - vs - | | 7/18/2022 |
| | : | |
| TYLER JACOB YORK, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2020-12-1524

Michael T. Gmoser, Butler County Prosecuting Attorney, and John Heinkel, Assistant Prosecuting Attorney, for appellee.

Michelle Temmel, for appellant.

**S. POWELL, J.**

{¶ 1}   Appellant, Tyler Jacob York, appeals from his conviction in the Butler County Court of Common Pleas after a jury found him guilty of three felony drug offenses.  For the reasons outlined below, we affirm York's conviction.

{¶ 2}   On May 12, 2021, a Butler County Grand Jury returned a three-count

indictment charging York with three felony drug offenses all in violation of R.C. 2925.11(A). Those three felony drug offenses were single counts of third-degree felony aggravated possession of methamphetamine, fifth-degree felony possession of a fentanyl-related compound, and fifth-degree felony possession of drugs. The charges arose after York was found to be in possession of 9.88 grams of methamphetamine, .14 grams of fentanyl, and 3.49 grams of psilocin following a traffic stop of a vehicle in Trenton, Butler County, Ohio at approximately 1:00 a.m. on November 17, 2020.[1] There is no dispute that York was a passenger sitting in the vehicle's front seat when that traffic stop was effectuated. There is also no dispute that the stop and subsequent search of that vehicle were constitutionally permissible and not violative of York's rights guaranteed to him under the Fourth Amendment to be free from unreasonable searches and seizures.

{¶ 3} On November 8, 2021, a one-day jury trial was held on the matter. During trial, the jury heard testimony from three witnesses. The first two witnesses were Officers David Foley with the Trenton Police Department and Officer Lindsey Schwarber with the Middletown Police Department. Officers Foley and Schwarber testified regarding the traffic stop and subsequent canine sniff of the vehicle in which York had been a passenger. The third witness was Mary Kern, an investigator with the Butler County Prosecutor's Office. Kern testified regarding the authenticity of an audio recording of two jail-house phone calls York purportedly made while York was in jail awaiting trial. The following is a summary of those three witnesses' trial testimony.

{¶ 4} Shortly before 1:00 a.m. on November 17, 2020, Officer Foley saw a vehicle parked in front of an apartment located at 310 Maple Avenue, Trenton, Butler County,

---

1. Psilocin is a naturally occurring substance that is found in most psychedelic mushrooms. Or, as this court has stated previously, psilocin is "a substance commonly known as hallucinogenic mushrooms." *State v. Fox*, 12th Dist. Fayette No. CA2008-03-009, 2009-Ohio-556, ¶ 3.

Ohio. Officer Foley was familiar with that apartment because of prior drug complaints from the apartment's neighbors. After seeing where the vehicle was parked, Officer Foley watched as the vehicle left the apartment's parking lot and turned out onto the street. Once there, Officer Foley began following the vehicle and watched as someone in the vehicle committed a littering violation by flicking a lit cigarette butt out one of the vehicle's windows. Upon seeing this, Officer Foley initiated a traffic stop of the vehicle for littering.

{¶ 5} Once that traffic stop was effectuated, Officer Foley approached the vehicle and explained to the vehicle's driver, C.H., why the vehicle was being stopped. As noted above, there is no dispute that York was a passenger sitting in the vehicle's front passenger seat when that traffic stop was made. Officer Foley then asked C.H., as well as the vehicle's other two occupants, York and another unnamed individual, to identify themselves. This included Officer Foley asking York for his last name. To this, Officer Foley testified that York "stuttered" and asked "why it mattered." The record indicates Officer Foley later positively identified York as the man sitting in the vehicle's front passenger seat by looking at York's image filed with the Ohio Bureau of Motor Vehicles.

{¶ 6} After speaking with the vehicle's three occupants, Officer Foley then returned to his cruiser and requested a canine unit be sent from the Middletown Police Department so that a canine sniff could be conducted on the vehicle. Shortly thereafter, Officer Schwarber arrived at the scene with her canine partner, Maverick. The vehicle's three occupants were then removed from the vehicle to allow Maverick to complete his work. York, however, did not immediately exit from the vehicle. Officer Foley testified that York instead "started fidgeting with his seat belt," "looking around," and "looking down at the floorboard of the car" while "holding on very tightly," with a "white-knuckle kind of death grip," to a black backpack sitting "between his legs." There is no dispute that York left the backpack in the vehicle when he eventually did exit from the vehicle so that Maverick could

complete his sniff of the vehicle.

{¶ 7} Upon York exiting from the vehicle, Officer Foley had York sit in the rear of his cruiser while Officer Schwarber led Maverick around the outside of the vehicle. This includes the area where York had just moments before been sitting in the vehicle's front passenger seat. There is no dispute that during this canine sniff Maverick alerted on the vehicle's passenger side door seam near to where the vehicle's passenger side door handle is located indicating the presence of drugs inside the vehicle. Once Maverick alerted on the vehicle's passenger side door seam, Officer Schwarber notified Officer Foley of the alert. Officer Foley then conducted a complete search of the vehicle. This included a search of the black backpack Officer Foley had seen York holding with a "white-knuckle kind of death grip" between his legs a few minutes prior.

{¶ 8} Officer Foley's search of that black backpack resulted in the discovery of (1) a "tied-off" piece of a plastic grocery bag containing a white/clear crystalized substance that Officer Foley believed to be crystal methamphetamine, (2) a glasses case containing two folded coupons that had within those folds two bindles of a white powdery substance that Officer Foley believed to be fentanyl, and (3) a plastic baggy containing a brown mushroom-like substance that Officer Foley believed to be psilocin. Officer Foley also discovered a syringe underneath the vehicle's front passenger seat where York had been sitting. Subsequent tests of the three substances located in the black backpack revealed those substances were 9.88 grams of methamphetamine, .14 grams of fentanyl, and 3.49 grams of psilocin. Officer Foley did not discover any other drugs in the vehicle except for the drugs located in the black backpack York had been holding between his legs.

{¶ 9} York was subsequently arrested and taken to jail. While in jail awaiting trial, York's personal identification number was used to make 999 phone calls to one phone number with another 348 phone calls to another phone number. Within those over one

thousand phone calls, portions of two of those calls were admitted into evidence over York's objection and played for the jury. The first phone call played for the jury took place on November 23, 2020. During that phone call, an individual believed to be York stated, "Whenever you get in somebody's car, the person's whose car it is knows that they are responsible for you and whatever you got, you feel me? * * * So I'm free, you know what I mean?" That same individual also stated that the passwords to his two "Pandemic Unemployment Assistance" accounts, accounts this individual referred to as "PUA," included York's full name, a number, and, for one of the accounts, a special character. The second phone call played for the jury took place on October 12, 2021. During that phone call, an individual believed to be York stated, "What? The fact that the bookbag was between my legs? * * * I was always taught that whatever you bring in my car is my responsibility, no matter what."

{¶ 10} After providing the jury with its final jury instructions, and following the jury's deliberations, the jury returned a verdict finding York guilty as charged. Two days later, on November 10, 2021, the trial court held a sentencing hearing and sentenced York to a total, aggregate 48-month prison term, less 101 days of jail-time credit.[2] The trial court also notified York that he would be subject to an optional two-year postrelease control term upon his release from prison. The trial court issued its judgment of conviction entry on November 16, 2021. York filed a timely notice of appeal from his conviction on November 24, 2021. York's appeal now properly before this court for decision, York raises two assignments of error for review.

{¶ 11} Assignment of Error No. 1:

---

2. York's total, aggregate 48-month prison term consisted of 36 months for the third-degree felony aggravated possession of methamphetamine, a consecutive 12 months for the fifth-degree felony possession of a fentanyl-related compound, and a concurrent 12 months for the other fifth-degree felony possession of drugs.

{¶ 12} THE TRIAL COURT ERRED WHEN IT ALLOWED THE ADMISSION OF JAIL HOUSE PHONE CALLS.

{¶ 13} In his first assignment of error, York argues the trial court erred by admitting into evidence the audio recording Mary Kern testified she had made of the two jail-house phone calls York purportedly made from jail while awaiting trial in this case. To support this claim, York argues it was error for the trial court to admit that audio recording into evidence because the recording was not properly authenticated by Kern as required by Evid.R. 901(A). We disagree.

{¶ 14} Pursuant to Evid.R. 901(A), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "This threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity." *State v. Blake*, 12th Dist. Butler No. CA2011-07-130, 2012-Ohio-3124, ¶ 28, citing *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist.1991). "The state instead needs only to demonstrate a 'reasonable likelihood' that the evidence is authentic." *State v. Panzeca*, 12th Dist. Warren No. CA2019-03-023, 2020-Ohio-326, ¶ 26. Both circumstantial evidence and direct evidence may be used to prove the authenticity of evidence. *State v. Vermillion*, 4th Dist. Athens No. 15CA17, 2016-Ohio-1295, ¶ 14.

{¶ 15} "Such evidence may be supplied by the testimony of a witness with knowledge that a matter is what it is claimed to be." *State v. Brantley*, 12th Dist. Warren No. CA2006-08-093, 2008-Ohio-281, ¶ 34, citing Evid.R. 901(B)(1). This creates a "liberal standard for authentication of telephone calls," *State v. Reno*, 4th Dist. Ross No. 04CA2759, 2005-Ohio-1294, ¶ 18, citing *State v. Vrona*, 47 Ohio App.3d 145, 149 (9th Dist.1988), that this court reviews for an abuse of discretion. *State v. Searles*, 1st Dist. Hamilton Nos. C-180339 and C-180340, 2019-Ohio-3109, ¶ 7. "An abuse of discretion implies that the

court's attitude was unreasonable, arbitrary, or unconscionable." *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, ¶ 90.

{¶ 16} As noted above, the state called Kern, an investigator with the Butler County Prosecutor's Office, to authenticate the audio recording that she made of two jail-house phone calls York purportedly made while in jail awaiting trial in this case. To do this, Kern testified that as an investigator she has an account that allows her access to the "jail phone call system" that the Butler County Sheriff's Office uses to record and store phone calls made by the inmates of the Butler County Jail. This account includes a username and password that Kern testified she uses to "log in" to the system and "do a search." Kern testified that these searches are done by entering into the system "the inmate's name" and the "particular date range" to be searched.

{¶ 17} Kern testified that the search of York's name returned over one thousand phone calls made from York's personal identification number between November 17, 2020 and November 2, 2021. Kern testified that within those over one thousand phone calls were the two jail-house phone calls at issue here. Kern testified that both of those phone calls included references to York's name, including one where the person who answered says, "Hi, Ty," as well as passwords being discussed that included York's full name, a number, and a special character, and to "a traffic stop in Trenton containing drugs in a bag." Kern also testified the audio recording she made of those two phone calls was not edited, but was instead an exact copy of the two jail-house phone calls she downloaded from the "jail phone call system."

{¶ 18} York argues Kern's testimony did not lay a "proper foundation as to the authenticity" of the audio recording she made of the two jail-house phone calls at issue. According to York, this is because: (1) Kern could not herself identity York's voice on either of the two calls; (2) Kern was not a records custodian with the Butler County Sheriff's Office,

but instead an investigator with the Butler County Prosecutor's Office; and (3) Kern had "no idea as to the mechanism" that the Butler County Sheriff's Office used to record the two jail-house phone calls at issue. According to York, this is also because (4) Kern could not herself testify as to the "reliability" of the system used by the Butler County Sheriff's Office to "record and store" jail-house phone calls, and because (5) Kern had "no idea as to the phone call's truth or accuracy."

{¶ 19} However, although Kern may not have been the best, most knowledgeable witness the state could have called to authenticate the audio recording at issue, Kern's testimony was still more than enough to satisfy the low bar for authentication under Evid.R. 901(A). This is because Kern was a person with knowledge of how the audio recording was made. This holds true even though Kern could not herself identify York's voice on the audio recording when considering York's identity was plainly established through the specific content of the calls, as well as the jail phone call system, and the personal identification number associated with York. *See, e.g., State v. Wade*, 11th Dist. Lake No. 2019-L-065, 2020-Ohio-2894, ¶ 16 ("the identity of the inmate [in a jail-house phone call] was established through the jail calling system and [personal identification number] associated with the inmate"). That Kern could not identify York's voice goes to the weight of the evidence rather than to the audio recording's admissibility. Therefore, finding no merit to any of the arguments raised by York herein, Kern's first assignment of error lacks merit and is overruled.

{¶ 20} Assignment of Error No. 2:

{¶ 21} THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR AGGRAVATED POSSESSION OF DRUGS (METHAMPHETAMINE), POSSESSION OF A FENTANYL-RELATED COMPOUND AND AGGRAVATED POSSESSION OF DRUGS.

{¶ 22} In his second assignment of error, York argues the state presented insufficient evidence to support the jury's verdict finding him guilty of the three felony drug offenses for which he was charged. York also argues his conviction for each of those three felony drug offenses was against the manifest weight of the evidence. We disagree with both of York's claims.

{¶ 23} "A claim challenging the sufficiency of the evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 165, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). "When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. "The relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Roper*, 12th Dist. Clermont No. CA2021-05-019, 2022-Ohio-244, ¶ 39, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34. A reversal for insufficient evidence requires the "discharge of the defendant." *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, ¶ 30.

{¶ 24} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-

2372, ¶ 14. When determining whether a conviction is against the manifest weight of the evidence, an appellate court "must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34. But, even then, the determination of witness credibility is primarily for the trier of fact to decide at trial. *State v. Baker*, 12th Dist. Butler No. CA2019-08-146, 2020-Ohio-2882, ¶ 30, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This court, therefore, "will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 10, citing *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43. "[A] new trial is the appropriate remedy when a reviewing court determines that a criminal conviction is against the manifest weight of the evidence." *State v. Fips*, 160 Ohio St.3d 348, 2020-Ohio-1449, ¶ 10.

{¶ 25} Given these principles, it is now well established that "[t]he concepts of sufficiency of the evidence and weight of the evidence are legally distinct." *State v. Fannin*, 12th Dist. Warren No. CA2020-03-022, 2021-Ohio-2462, ¶ 47, citing *State v. Wright*, 12th Dist. Butler No. CA2012-08-152, 2014-Ohio-985, ¶ 10. That is to say, "[a] verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it." *State v. Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, ¶ 80, citing *State v. Robinson*, 162 Ohio St. 486, 487 (1955). Because of this, "a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Perkins*, 12th Dist. Fayette No. CA2009-10-019, 2010-Ohio-2968, ¶ 9. This is

because legally sufficient evidence is required to take a case to the jury. *State v. Hart*, 12th Dist. Brown No. CA2011-03-008, 2012-Ohio-1896, ¶ 43. Therefore, although challenges to the sufficiency of the evidence and the manifest weight of the evidence require the application of quantitatively and qualitatively different concepts, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19; *State v. August*, 12th Dist. Warren No. CA2018-12-136, 2019-Ohio-4126, ¶ 48.

{¶ 26} As noted above, York was convicted of three felony drug offenses all in violation of R.C. 2925.11(A). Pursuant to that statute, "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog."[3] R.C. 2901.22(B) defines when a person acts "knowingly" and states:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 27} Whether a person was aware of an object's presence may be established through circumstantial evidence. *State v. Whitehead*, 4th Dist. Scioto No. 20CA3931, 2022-Ohio-479, ¶ 90. "Circumstantial evidence is proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Stringer*,

---

3. There is no dispute that all three substances, i.e., methamphetamine, fentanyl, and psilocin, giving rise to the felony drug offenses of which York was convicted, are controlled substances.

12th Dist. Butler No. CA2012-04-095, 2013-Ohio-988, ¶ 31. Therefore, "[a]bsent a defendant's admission regarding his knowledge, whether a person acts knowingly can only be determined from all the surrounding facts and circumstances, including the doing of the act itself." *State v. Hilton*, 12th Dist. Butler No. CA2015-03-064, 2015-Ohio-5198, ¶ 20. "Whether a defendant knowingly possessed a controlled substance is a question of fact for the trier of fact." *State v. Reyes*, 6th Dist. Wood No. WD-02-069, 2004-Ohio-2217, ¶ 20, citing *State v. Jones*, 1st Dist. Hamilton No. C-880620, 1990 Ohio App. LEXIS 18 (Jan. 10, 1990).

{¶ 28} The terms "possess" and "possession" are defined by R.C. 2925.10(K) to mean "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." "Possession may be constructive or actual." *State v. Bollheimer*, 12th Dist. Warren No. CA2019-02-014, 2020-Ohio-60, ¶ 33. "Actual possession means appellant had the items within his immediate, physical control." *State v. Banks*, 182 Ohio App.3d 276, 2009-Ohio-1892, ¶ 10. "Constructive possession exists when one is conscious of the presence of the object and able to exercise dominion and control over it, even if it is not within one's immediate physical possession." *State v. Lee*, 12th Dist. Fayette Nos. CA2020-09-014 and CA2020-09-015, 2021-Ohio-2544, ¶ 21. "Constructive possession may be proven by circumstantial evidence alone." *State v. Graves*, 12th Dist. Clermont No. CA2015-03-022, 2015-Ohio-3936, ¶ 22. Therefore, "[a]bsent a defendant's admission, the surrounding facts and circumstances, including a defendant's actions, are evidence that a trier of fact may consider in determining whether the defendant had constructive possession." *State v. Fester*, 12th Dist. Clermont No. CA2019-05-043, 2021-Ohio-410, ¶ 58.

{¶ 29} York argues the evidence presented by the state to prove he knowingly possessed, either actually or constructively, any of the three substances giving rise to the three felony drug offenses for which he was convicted was lacking in both sufficiency and weight. This is because, according to York, "no one really knew who owned what in the car." To support this claim, York notes that there was no "identifying information" in the backpack where the drugs were found that "tied" him to either the backpack or its contents. However, while we agree that there were no photos, driver's licenses, credit cards, or utility bills found within that backpack indicating to whom the backpack belonged or was owned by, the record nevertheless indicates Officer Foley saw York holding onto that backpack "very tightly," with a "white-knuckle kind of death grip," when Officer Foley asked York to get out of the car so that Officer Schwarber could have her canine partner, Maverick, conduct a canine sniff of the vehicle.

{¶ 30} The record also contains the incriminating statements York made during the two jail-house phone calls played for the jury that he was "free" because the only evidence the state had to prove the drugs were his was "[t]he fact that the bookbag was between [his] legs" given that "[he] was always taught that whatever you bring [into another person's] car is [that person's] responsibility, no matter what." When taken together, this is more than enough evidence to support the jury's guilt finding for each of the three felony drug offenses that York was convicted. This is because, contrary to what York had apparently been taught, "[o]wnership of the controlled substance need not be proven to establish constructive possession." *State v. Adams*, 12th Dist. Butler No. CA2012-11-240, 2013-Ohio-4639, ¶ 10. This is also because "[t]he discovery of readily accessible drugs in close proximity to the accused constitutes circumstantial evidence that the accused was in constructive possession of the drugs." *State v. Fultz*, 12th Dist. Butler No. CA2015-06-103, 2016-Ohio-1486, ¶ 13. Therefore, finding York's conviction for all three felony drug

offenses was supported by sufficient evidence and not against the manifest weight of the evidence, York's second assignment of error also lacks merit and is overruled.

**{¶ 31}** Judgment affirmed.

PIPER, P.J., and BYRNE, J., concur.